# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KIMBERLY-CLARK WORLDWIDE, Inc., and ,
KIMBERLY-CLARK GLOBAL SALES, LLC,

        Plaintiffs,

    v.                                 Case No. 09-C-0916

FIRST QUALITY BABY PRODUCTS, LLC, and
FIRST QUALITY RETAIL SALES, LLC,

        Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

### I. Procedural History

1.     On September 21, 2009, Plaintiffs Kimberly-Clark Worldwide, Inc., and Kimberly-Clark Global Sales, LLC, (collectively "K-C") filed this action for patent infringement against Defendants First Quality Baby Products, LLC, and First Quality Retail Sales, LLC (collectively "First Quality") alleging that First Quality was infringing various patents K-C held relating to disposable training pants used to toilet train young children by making and offering for sale a new training pant product covered by one or more claims in K-C's patents.

2.     On September 29, 2009, K-C filed a motion for a preliminary injunction to enjoin First Quality from making, using, selling, or offering to sell, marketing, advertising and/or distributing in the United States its new disposable training pants with refastenable sideseams. K-C

alleged that First Quality's new product infringed two of its patents: U.S. Patent Nos. 6,849,067 ("the '067 patent") and 6,454,751 ("the '751 patent").

3.     On October 8, 2009, after consultation with the parties, the Court directed First Quality to respond to K-C's motion by November 3, 2009, and K-C to reply by November 10, 2009. An evidentiary hearings was scheduled to commence on November 16, 2009. Following a two-day hearing, the Court took the matter under advisement. Having considered the evidence presented and the briefs and argument of counsel, the Court enters the following findings of fact and conclusions of law in support of its order denying K-C's motion for a preliminary injunction against the defendants.

## II.  Legal Standard Governing Preliminary Injunctions In Patent Cases

4.     In deciding whether to grant a motion for a preliminary injunction, the court must consider four factors: 1) likelihood of success on the merits; 2) irreparable harm if an injunction is not granted; 3) the balance of hardships; and 4) the impact on the public interest. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). No single factor, taken individually, mandates such relief. Each factor must be weighed in view of the other factors and against the relief requested. *Id.* However, as the First Circuit has observed, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

5.     To establish a reasonable likelihood of success on the merits in a patent case, a plaintiff must show that in light of the presumptions and burdens that will inhere at trial on the merits: 1) the plaintiff will likely prove that the defendant infringes the patent, and 2) the plaintiff's

2

infringement claim will likely withstand the defendant's challenges to the validity and enforceability of the patent. *See Amazon.com*, 239 F.3d at 1350. "If [the defendant] raises a substantial question concerning either infringement or validity, *i.e.*, asserts an infringement or invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Id.* at 1350-51; *see also Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1379 (Fed. Cir. 2009) ("[I]f the trial court concludes there is a 'substantial question' concerning the validity of the patent, meaning that the alleged infringer has presented an invalidity defense that the patentee has not shown lacks substantial merit, it necessarily follows that the patentee has not succeeded in showing it is likely to succeed at trial on the merits of the validity issue.").

### III. Likelihood of Success On the Merits at Trial

6. In support of its motion for a preliminary injunction, KC has asserted Claim 8 of the '067 and Claim 4 of the '751 patent. Claim 8 of the '067 patent reads:

> 8. A disposable absorbent article, comprising an absorbent chassis and a fastening system for releasably attaching a front waist region of the absorbent chassis to a back waist region of the absorbent chassis to define a refastenable pant having a waist opening and a pair of leg openings, the refastenable pant comprising:
>
> a pair of elastomeric, nonwoven front side panels extending from the waist opening to each leg opening;
> a pair of elastomeric, nonwoven back side panels extending from the waist opening to each leg opening;
> a pair of refastenable seams extending from the waist opening to each 1% opening, each refastenable seam disposed between an elastomeric front side panel and an elastomeric back side panel; and
> a pair of elastomeric leg members which partially encircle each leg opening, wherein each elastomeric leg member extends from adjacent an elastomeric front side panel in the front waist region to adjacent an elastomeric back side panel in the back waist region.

('067 patent, col. 23 line 1- col. 24 line 2.) Claim 4 of the '751 patent reads:

3

4. A disposable absorbent pant defining a longitudinal axis, front and back longitudinally spaced waist regions, and a crotch region which extends between and interconnects the front and back waist regions, the absorbent pant comprising:

a liquid permeable bodyside liner;
a liquid impermeable outer cover bonded to the bodyside liner;
an absorbent assembly disposed between the bodyside liner and the outer cover;
elastomeric side panels bonded to the outer cover in at least the back waist region;
a pair of first fastening components disposed on the elastomeric side panels in the back waist region; and
a pair of second fastening components disposed in the front waist region;

wherein:

the first and second fastening components comprise mechanical fastening elements that are adapted to releasably engage one another to define mating pairs of fasteners and form a waist opening and a pair of leg openings;
each of the first and second fastening components has an inner end edge disposed toward one of the leg openings, an opposite outer end edge disposed toward the waist opening, a length dimension that is generally parallel to the longitudinal axis, a width dimension, a length-to-width ratio of about 5 or greater; and
at least one fastening component of each mating pair of fasteners has at least one hinge area that transversely bisects the at least one fastening component, and the hinge area is offset along the length dimension closer to the inner end edge than the outer end edge.

('751 patent, col. 17 line 43 - col. 18 line 10.)

### A. Patent Infringement

7.     Infringement analysis requires the Court to first determine the meaning of the claim and then compare the properly construed claim to the accused device. *See Amazon.com*, 239 F.3d at 1350. All claims must be construed in light of the specification and the prosecution history.

4

### 1. Background of the '067 patent and the '751 patent.

8.      Training pants are intended to transition young children from diapers to underwear and to help them with their toilet training.  K-C introduced disposable training pants to the market in 1989 under its PULL-UPS® trademark.  This new product differed from disposable diapers in that it had the appearance of underwear with sides that were closed and thus did not need to be fastened around the child as the child was lying on his or her back.  Children could pull them on or off like underwear, giving them the sense that they were no longer babies.  At the same time, because they were disposable, PULL-UPS offered the convenience of disposable diapers in the event of an accident.  K-C heavily marketed its new product to consumers and retail customers, and within a short period of time, other companies developed their own disposable training pants and began competing with K-C.

9.      The '067 and '751 patents relate to an innovation K-C introduced to its disposable training pants in 2002.  Both have filing dates of November 22, 1999, but the '067 patent was not issued until February 1, 2005, while the '751 patent was issued on September 24, 2002.  Each of these patents describe a disposable training pant with side seams that are easy to open and can be refastened.  The refastenable side seams make it easier for the caregiver to check the training pants to see if there was an accident and, when an accident does occur, to remove the pants and clean the child.  The president of K-C's North American Baby and Child Care business described the new innovation as a "game changer" in the industry.  K-C began marketing its new improved Pull-up with the "easy open sides" feature and quickly increased its market share.  Although K-C does not presently make products covered by the '751 patent, claims 8-10 of the '067 patent cover K-C's Pull-up products as currently sold.  (Decl. of G.A. M. Butterworth, ¶¶ 156-57.)

5

## 2. Infringement of the '067 Patent

10.     K-C will likely prevail on its allegation that the training pants First Quality has recently begun manufacturing and offering for sale infringes claims 8-10 of the '067 patent. The relevant claim limitation describes "a pair of refastenable seams extending from the waist opening to each leg opening," (the Extending Seam Limitation). ('067 patent, col. 23, lines 12-15.) K-C's technical expert testified credibly that First Quality's training pants met this limitation either literally or by equivalents.

11.     First Quality argues that its product does not meet this limitation because the seams on its training pants do not abut the waist opening or the leg opening. Although it acknowledges that the patent specification states that the seams can extend the full length from the waist opening to the leg opening or can be shorter than this full length, First Quality contends that during the prosecution history K-C limited Claim 8 to only those seams that extend the full length from the waist opening to the leg opening. In support of it argument, First Quality notes that during the prosecution, the patent examiner initially rejected the application which eventually became Claim 8 of the '067 patent as being unpatentable based on the combined teachings of U.S. Patent 5,846,262 to Sayama et al. ("Sayama") and U.S. Statutory Invention Registration No. H1674 to Ames et al. ("Ames"). K-C distinguished Sayama and Ames by noting that neither disclosed refastenable seams extending from the waist opening to the leg opening, but instead both disclosed fasteners for diapers that were "nowhere near the leg areas." First Quality argues from this history that K-C disclaimed from Claim 8 seams that are shorter than the full length extending from the waist opening to the leg opening. Since the seams in its own product do not extend the full length

6

from the waist opening to the leg opening, First Quality claims its product does not infringe Claim 8.

12.     Prosecution disclaimer only occurs where there the applicant makes "clear" and "unmistakable" arguments limiting the meaning of a claim term.  *SanDisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1286-87 (Fed. Cir. 2005).  An ambiguous statement cannot create a disclaimer that limits claim terms.  *Id.* at 1287.

13.     Here, the Court concludes that there was no disclaimer.  K-C did not clearly and unmistakably limit the meaning of "from" and "to" in such a way as to preclude application to seams that do not abut the waist opening and the leg opening.  Seams that extend almost the entire length as described in the specification and depicted in the embodiments are covered by the '067 patent.

14.     First Quality also argues that its training pants do not infringe claim 8 of the '067 patent because its product does not have a single continuous seam that extends from the waist opening to the leg opening.  Instead, First Quality contends that its fasteners create multiple seams as opposed to one continuous seam from the waist to the leg openings.

15.     Claim 8 does not require the fastener to create a continuous seam with no open spaces.  In fact, the specification expressly states that "the refastenable seam may comprise individual fastening material *with narrow spacings therebetween*." ('067 patent, col. 5, lines 27-28 (italics added)).  Accordingly, the fact that such spacings exist in the fasteners that create the seam in the First Quality products does not mean that its product does not infringe Claim 8 of the '067 patent.  The Court concludes that K-C is likely to prevail on its allegation that First Quality's product infringes claims 8-10 of the '067 patent.

7

### 3. Infringement of the '751 Patent

16.     K-C will also likely prevail on its allegation that First Quality's training pants infringe Claim 4 of the '751 Patent.  As relevant here, Claim 4 of the '751 patent describes a pair of first and second fastening components disposed on the elastomeric side panels in the back waist region and in the front waist region wherein each of the first and second fastening components has a length-to-waist ratio of about five or greater, and wherein at least one fastening component of each mating pair of fasteners has "at least one hinge area that transversely bisects the at least one fastening component, and the hinge area is offset along the length dimension closer to the inner end edge than the outer end edge." ('751 Patent, col. 18, lines 7-10.)  K-C's technical expert credibly testified that First Quality's training pant met these limitations either literally or by equivalents.

17.     First Quality challenges K-C's allegation that its training pants infringe Claim 4 of the '751 patent in two respects.  First Quality denies that each of the fastening components of its training pant meet the length-to-width ratio of about five or greater.  First Quality also denies that the fastening components of its training pants meet the hinge limitation of Claim 4.

18.     First Quality's contention that none of the fastening components of its training pants meet the length-to-width ratio of Claim 4 is based on the fact that the entire outer surface of the back side panel of its training pants is composed of a material that will mate with the fastener component of the front side panel.  First Quality argues that the first fastening component is therefore the entire back side panel, which has a length-to-width ratio of 1.3.  As to the second fastening component disposed on the front side panel, First Quality contends that the length of the hook segments of the fastening component, leaving out gaps, is about 80 mm.  When divided by the width of about 20 mm, the resulting length-to-width ratio comes out to four. (Decl. of John Blevins, ¶ 52.)  Thus, First

8

Quality argues that neither the first or second fastening components on its training pant meet Claim 4's length-to-width ratio.

19.     First Quality also denies that the fastening components of its training pants meet Claim 4's hinge limitation.  Based on the language of claim and the specification of the patent, the Court concludes that the phrase "hinge area" as used in Claim 4 means "an area within the seam lacking fastening elements."  First Quality contends its fastening components do not meet this limitation of Claim 4 because there are no gaps in the polypropylene (plastic) substrate that forms the base of its second fastening component.  First Quality notes that the specification for the '751 patent describes several methods for forming the hinges, none of which were used by First Quality.  First Quality also notes that Figure 6 of the patent depicts a hinge area comprised of gaps in the fastening components which create a space containing only the underlying fabric.  Because the fastening components of its training pants are made of a continuous plastic base that completely covers the fabric beneath the components, First Quality contends it lacks the hinge limitation described in Claim 4.

20.     First Quality's training pants meet both the length-to-width ratio limitation and the hinge limitation of Claim 4 of the '751 patent either literally or by equivalents.  Both the first fastening components and the second fastening components of First Quality's training pants meet the length-to-width ratio limitation.  The fact that the entire outer surface of the back side panel is composed of a material that will mate with the fastening component of the front side panel does not mean that the entire surface of the back side panel constitutes the fastening component.  In such a configuration, the fastening component is integral with the side panels, an embodiment that is expressly disclosed in the specification.  ('751 Patent, col. 15, lines 14-18.)  In this embodiment,

9

the first fastening component is that portion of the back side panel that mates with the second fastening component. It thus has the same dimension as the second fastening component. The second fastening component clearly has a length-to-width ratio of about five or greater. The length is measured from the beginning to the end of the base of the fastening component without excluding gaps in the placement of the micro-hook fasteners that mate with the first fastening component. It thus follows that the first and second fastening components meet the length-to-width ratio of Claim 4.

21. First Quality's training pants also meet the hinge limitation of the '751 patent. First Quality's argument to the contrary is based entirely on a comparison of its product with examples in the specification, as opposed to the claim language at issue. First Quality mistakenly focuses on how the hinge area may be made or how it may function rather than what a hinge area, as described in the patent, actually is. The spacings in First Quality's second fastening component are identical to the hinge area defined in claim four. Accordingly, First Quality's product meets the hinge limitation of Claim 4.

22. Alternatively, even if First Quality's product did not literally infringe Claim 4 of the '0751 patent, it would do so under the doctrine of equivalents. Under the doctrine of equivalents, infringement may be found even where there is no literal infringement if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention. *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 901-02 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 857 (1984). Making the entire outer surface of the back side panel out of a material that will mate with the fastening component on the front side panel that meets the length-to-width ratio is the equivalent

10

of providing a second fastening component that meets the ratio. When fastened together, the two components form a seam having the same length-to-width ratio called for by the Claim in substantially the same way. The Court therefore concludes that K-C is likely to prevail on its allegation that First Quality's product infringes Claim 4 of the '751 patent.

### B. Patent Validity

23. First Quality also challenges the validity of both the '067 patent and the '751 patent. Of course, both patents are presumed valid. 35 U.S.C. § 282. An alleged infringer who raises validity as an affirmative defense has the ultimate burden of persuasion at trial and must prove invalidity by clear and convincing evidence, as well as the initial burden of going forward with the evidence to support its invalidity allegation. *Technology Licensing v. Video Tech, Inc.*, 545 F.3d 316, 327 (Fed. Cir. 2008). At the preliminary injunction stage, the trial court does not resolve the validity question, but only makes an assessment of the persuasiveness of the challenger's evidence, recognizing that it is doing so without all evidence that may come out at trial. *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 883-83 (Fed. Cir. 1992). At this stage, the patentee, or movant, must persuade the court that, despite the challenge presented to validity, the patentee nevertheless is likely to succeed at trial on the validity issue. "While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks substantial merit." *Id.* at 883; *see also Titon Tire Corp. v. Case New Holland, Inc*., 566 F.3d 1372, 1377 (Fed. Cir. 2009).

### 1. Validity of the '067 Patent

#### a. Anticipation under 35 U.S.C. § 102

24. First Quality contends that the '067 patent is invalid under 35 U.S.C. § 102 as anticipated by U. S. Patent No. 5,269,766 (the "Lancaster Patent"), which was issued in December

of 1993, some seven years before the application for what became the '067 patent. "Anticipation" in patent usage means that the claimed invention was previously known and described in a printed publication, explicitly or inherently. Anticipation is established by documentary evidence, often previously issued patents, and requires that every claim element and limitation is set forth in a single prior art reference, in the same form and order as in the claim. *See In re Omeprazole Patent Litigation*, 483 F.3d 1364, 1373 (Fed. Cir. 2007); *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1267 (Fed. Cir. 1991). An anticipating reference must enable that which it is asserted to anticipate. *Omeprazole*, 483 F.3d at 1378 ("To 'anticipate,' the identical subject matter must not only be previously known, but the knowledge must be sufficiently enabling to place the information in the possession of the public."); *Elan Pharmaceuticals, Inc. v. Mayo Found. for Medical Educ. & Research*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (same). First Quality contends that each of the features required by Claim 8 of the '067 patent were disclosed in the Lancaster patent.

25.     The '067 patent is not invalid as anticipated by Lancaster. While Lancaster does disclose a seam that runs from the waist opening to the leg opening, it does not disclose the elastomeric side panels of Claim 8 that extend from the waist opening to the leg opening. First Quality argues that Lancaster describes a method of making waist extensions which hold the gripping means and target means (fastening components) of the article elastomeric and thus even this feature is also disclosed. Lancaster teaches that longitudinal ribbons of a heat shrinkable polymeric material can be placed along each of the opposed side margins and along the front and back waist boundary areas during manufacture to provide elasticized leg openings and an elasticized waist portion. First Quality argues that when such material is added in the manner described, Lancaster's four waist extensions become elastomeric side panels as claimed in the '067 patent. Thus, First Quality contends that Lancaster anticipates each and every feature of Claim 8.

12

26.     The addition of the heat shrinkable ribbons as described in Lancaster does not make the waist extensions elastomeric.  The gripping means and target means that comprise the fasteners in Lancaster must be in alignment in order to properly function.  Figures 4A through 6B of Lancaster show how these fastening components function.  K-C's technical expert explained that the rows and columns of the two sets of connectors could not be properly manufactured if they were made from elastomeric material.  Although First Quality's technical expert disagreed, I found K-C's expert more credible on this issue.  It seems clear from a review of Lancaster that while the waist areas and the leg openings can be made elastic, the waist extensions where the gripping and target means are located cannot.  These components consist of interlocking grooves and ridges that must be properly aligned in order the fasten.  To introduce elasticity into either or both the gripping and target means would change the alignment needed for proper functioning.  Furthermore, the embodiments shown in Lancaster depict the placement of the heat shrinkable ribbons, but they do not pass through the waist extensions.  At most, the heat shrinkable ribbons placed along the waist boundaries are anchored at the inner edge of the waist extensions.  There is no indication that they are intended to make the extensions elastomeric.  The same is true of the heat shrinkable ribbons placed along the side margins so as to elasticize the leg openings.  It is clear from Figure 1 of Lancaster that the heat shrinkable ribbons used for this purpose do not extend into the waist extensions.  The Court therefore concludes that Lancaster does not disclose the elastomeric side panels of Claim 8.  Accordingly, Lancaster does not anticipate the '067 patent.

### b.  Obviousness under 35 U.S.C. § 103

27.     First Quality also contends that Claims 8-10 of the '067 patent are invalid because they are obvious over Lancaster in view of U.S. Patent No. 4,940,464 (Van Gompel) and

13

International Patent Application Publication No. WO 97/46197 (Kling). A valid patent cannot be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains." 35 U.S.C. § 103. The Supreme Court recently reaffirmed the objective analysis a court or patent examiner must undertake when deciding whether a claimed invention is obvious:

> "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented."

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere of Kansas City*, 383 U.S. 1, 17-18 (1966).

28.     One skilled in the art for the '067 and 751 patents is a person with two-to-four years of work experience in product design and testing of disposable absorbent articles such as diapers, training pants and incontinence briefs.

29.     As noted above, Lancaster teaches a disposable absorbent garment having "a closure system which is easily unfastened and refastenable when desired, yet which maintains closure of the garment during periods of wearer activity." (Lancaster, col. 3, lines 49-52.) Moreover, like Claim 8, the seam created by the fastening system in Lancaster also extends from the waist opening to the leg opening. As also noted above, Lancaster does not teach the elastomeric side panels of Claim 8 of the '067 patent. Elastomeric side panels are a feature disclosed in Van Gompel, however. Indeed, as the '067 patent acknowledges, elastomeric side panels were known to one of

14

ordinary skill in the art at the time the application was filed. (col. 14, lines 62- through col. 15, line 2.) First Quality argues that "since Lancaster and Van Gompel combine to teach all of the elements of Claims 8-10 of the '067 Patent, Claims 8–10 are invalid as obvious." (First Quality's Br. In Opp. at 32.) First Quality also contends that Claims 8-10 of the '067 patent are obvious over Lancaster in view of Kling. Kling, in First Quality's view, discloses absorbent articles with elastomeric side panels. Thus, First Quality argues that Lancaster and Kling also combine to teach all of the elements of Claims 8-10 of the '067 patent. At the very least, First Quality argues, the cited prior art demonstrates that its defense has substantial merit, which at this stage of the proceedings should preclude issuance of a preliminary injunction.

30.    K-C argues that the '067 patent would not have been obvious in light of these references because the '067 patent describes a refastenable training pant whereas Lancaster and Kling describe diapers. K-C further argues that Van Gompel, the only reference that describes training pants, actually teaches away from combining refastenable seams with training pants. Van Gompel states that a "suitable training pant must be a garment having closed sides so that a child can raise and lower the garment as necessary without requiring the aid of a parent." (Van Gompel, col. 1, lines 42-45.) In the face of Van Gompel's clear teaching of the importance of closed sides, K-C argues that one of ordinary skill in the art would not have combined Lancaster and Van Gompel. K-C also argues that the waist extensions of Lancaster cannot be replaced with elastomeric material since, as noted above, if the waist extenders on which Lancaster's fastening components are located were elastomeric, the fastening components (*i.e.*, the gripping means and target means) would not function properly. Adding elastomeric material between the crotch portion and waist extenders would increase the size of the waist opening and thereby reduce or eliminate

15

the snugness of the waist.  For the same reasons, K-C contends that there would have been no reason to replace the waist extensions of Lancaster with Kling's elastomeric material or to add Kling's elastomeric material between the crotch portion in Lancaster and the waist extensions.  K-C also notes that Kling teaches away from adding the corner portions of Kling to Lancaster because the corner portions disclosed in Kling are portions of the elastic pants layer and elastic net that are integral to the entire garment, as opposed to elastomeric side panels that could be added to Lancaster.  Finally, K-C notes that Lancaster criticizes the use of the hook and loop fastening system featured in Kling.

31.    K-C also points to certain objective evidence of non-obviousness, including the fact that Van Gompel taught away from providing openings on the sides, the fact that LaFleur, an earlier patent for a refastenable "training panty" appears never to have been commercially developed, the extraordinary commercial success of its Easy Open PULL-UPS product, and the industry's acquiescence in K-C's patents.  Between its own brand name and the private label training pants it makes for select retailers, K-C notes that it has approximately 73% of the $900 million annual market for disposable training pants.  Its own consumer testing strongly suggests that it is the "easy open" feature of its product that accounts for much of its success.  Recognizing as much, several competitors have requested licenses under K-C's patents, requests which K-C has consistently refused.  Given this extraordinary commercial success, K-C notes that its competitors would have a strong financial incentive to examine K-C's patents and enter the market with a competing product if they felt the patents were vulnerable.  The fact that no competitor sought to do so for seven years, K-C argues, is strong evidence of non-obviousness.

16

32.     The Court finds that there is substantial merit to First Quality's defense that Claims

8-10 of the '067 patent are obvious in light of Lancaster, Van Gompel and Kling. Overall, the Court

is unconvinced that there is a clear line of demarcation in the relevant art between disposable

diapers and training pants. That line, to the extent it exists at all, seems to be more the result of

marketing efforts than clear differences in the patents themselves. Although it is true that K-C uses

the '067 patent in its Easy Up training pants product, the patent itself is not so narrowly defined.

It is entitled "Absorbent Articles With Refastenable Side Seams." It falls within the art generally

identified as disposable absorbent garments, which includes diapers, training pants and incontinence

briefs. Indeed, one of the benefits noted in the patent is that the garment it describes is "adaptable

to being used either as a diaper or a pant." ('067 patent, col. 1, lines 50-51.) Lancaster, as noted

above, describes a disposable absorbent garment with refastenable seams that extend from the waist

to the leg opening. Although Lancaster does not teach elastomeric side panels, Van Gompel does.

It is true that Van Gompel taught away from refastenable seams, instead emphasizing the

underwear-like quality of a disposable garment with solid sides. But as K-C's own marketing made

clear, Van Gompel's closed sides created a problem for care givers. They made it more difficult

to remove the article when the inevitable accident occurred. Lancaster reveals an obvious solution

to this problem, namely, refastenable seams. While K-C is correct that Lancaster's fasteners would

not have worked well with the elastomeric material Van Gompel and the '067 patent teach, Kling

used a hook and loop fastener of a similar type claimed in the '067 patent. And Kling also

contained elastomeric material "that extends transversely of the diaper outwardly of the side edges

of the outer material 11 and the barrier layer 9, such as to form four corner portions 13-16 in

respective front and rear parts of the diaper." (Kling, p. 13, lines 22-25.) Indeed, Kling seems to

17

provide a stronger basis for First Quality's anticipation defense than Lancaster. Kling describes "an absorbent article such as a diaper, an incontinence guard or like article that includes gripping means." (Blevins Decl., Ex. 13.) The diaper described in Kling is preferably meant to include "disposable diapers and openable and re-closable pant diapers." (Kling, p. 1, lines 28-29.) Incontinence guard is defined as "diapers primarily intended for older children or for adults." (Kling, p.1, lines 30-32.) K-C contends that Kling does not teach elastomeric side panels. Instead, K-C argues that Kling describes an elastic pants layer and elastic net that underlie the entire garment. The significance of this distinction is not clear. The fact that the entire pants layer of the garment is elastomeric does not mean that the side panels are not. But in any event, Kling is broad enough to cover a limitation of only elastomeric side panels. It notes that "the invention is not restricted to the elastic pants layer 12 disclosed in SE 9500386-9, and that the pants layer can be connected conventionally to the outer material 11 across the whole of the surface of said outer material or across parts thereof." (Kling, p. 14, lines 21-25.) Of course, the '067 patent is presumed valid, and both Van Gompel and Kling were considered by the patent examiner, giving even greater strength to the presumption of validity. Certainly, the Court does not conclude at this point that First Quality will succeed on its defense that Claims 8-10 of the '067 patent are obvious. The Court is unable to conclude, however, that the defense lacks substantial merit.

33.     In reaching this conclusion, the Court has considered the extraordinary commercial success of K-C's training pants product, the failure of other competitors to enter the market earlier, and the other objective evidence of non-obviousness on which K-C relies. While these are certainly factors a court can rely upon in deciding whether an invention claimed in a patent was obvious, they are not dispositive. The reluctance of other competitors to challenge a patent for a commercially

18

successful product can also be due to other factors, such as the substantial costs such a challenge entails, the uncertainty of success, and the overall investment needed to enter the market in the first place. The objective evidence cited by K-C does not override the analysis of the prior art which suggests the defense has substantial merit.

### 2. Validity of the '751 Patent

#### a. Anticipation under 35 U.S.C. § 102

34. First Quality contends that Claim 4 of the '751 patent is invalid under 35 U.S.C. § 102 as anticipated by Kling. First Quality notes that K-C's international application for the same patent was the subject of an "International Search Report" in which the European Patent Office ("EPO") stated that certain claims could not be considered novel or to involve an inventive step over Kling and an application by Johansson (U.K. Patent Application Publication No. GB 2,303,045). (Blevins Decl., Ex. 12.) K-C abandoned its international application, and so no final determination was ever made by that body. Although Kling and Johansson were cited as prior art by K-C in the proceedings before the United States PTO, along with over 100 other references, they were not highlighted. First Quality accuses K-C of "burying" the references so as to avoid rejection of its U.S. application. While First Quality has not alleged inequitable conduct on the part of K-C, First Quality does contend that, had Kling and Johansson been highlighted for the U.S. patent examiner, the '751 patent may well not have issued. Kling, in First Quality's view, teaches all of the limitations of Claim 4 of the '751 patent. Claim 4, First Quality argues, is therefore invalid as anticipated by Kling.

35. In response to First Quality's contention that Kling anticipates Claim 4 of the '751 patent, K-C argues that Kling does not disclose one element of the '751 patent. As it argued with

19

respect to the '067 patent, K-C contends that Kling does not disclose elastomeric side panels. As explained above, the Court finds that Kling is sufficiently broad to include elastomeric side panels. Accordingly, the Court concludes that K-C has failed to show that First Quality's defense that Claim 4 of the '751 patent is invalid as anticipated by Kling lacks substantial merit.

**b. Obviousness under 35 U.S.C. § 103**

36. First Quality contends that Claim 4 of the '751 patent is invalid under 35 U.S.C. § 103 because it is obvious over Kling in view of Johansson. In light of the Court's conclusion that First Quality's anticipation defense does not lack substantial merit, it is unnecessary to address obviousness. For completeness, however, the Court notes that Johansson teaches the use of fastening components for a diaper that, like the fasteners described by Claim 4, have intermittent spaces (four in the figure shown) to make the area "less rigid than when the fastener device extends along a distance which corresponds to the distance covered by the four smaller devices." (Johansson, p. 18, lines 18-20.) This feature, combined with the features depicted in Kling, gives First Quality's contention that Claim 4 of the '751 patent would have been obvious substantial merit.

**IV.  Remaining Factors**

37. Given the Court's conclusion that First Quality's invalidity defenses have substantial merit, it is not necessary to address the remaining factors for issuance of a preliminary injunction. Again for the sake of completeness, however, the Court will briefly set forth its findings on the remaining three factors.

20

38.     K-C is likely to suffer irreparable harm if First Quality is allowed to unfairly compete with K-C by selling an infringing product.  K-C has invested substantial resources in the research, development and marketing of its training pants product in reliance on the validity of its patents. While some of the monetary loss K-C is likely to sustain in the event First Quality unfairly competes with it are easily determined, a portion of it is not.  The portion of loss that may never be known would be that portion resulting from price erosion as K-C reduces its prices in an effort to compete with First Quality's new product.  Other competitors may also enter the market.  Various factors can lead to price reductions and it will likely be difficult or impossible to determine the extent to which price erosion, if it occurs, was the result of First Quality's actions.   In addition, if K-C does lower its prices in an effort to compete with First Quality or others, it is unlikely that K-C will simply be able to raise its price back to where it would have been if it ultimately prevails in the lawsuit.  Thus, there is a likelihood of future losses due to price erosion that will be difficult to capture if K-C prevails.  Other harms, including damaged relations with its retail sellers and loss of reputation as an innovator are more speculative and thus carry little weight.

39.     The balance of harms would also tip in K-C's favor assuming a likelihood of success on the merits.  K-C has made a substantial investment in its Easy Open Pull-Up product.  If its patents are valid, it should have the right to the benefit they provide over the lives of the patents. First Quality, on the other hand, was fully aware of K-C's patents at the time it decided to enter the market.  First Quality took a calculated risk when it decided to compete against K-C with a similar product, knowing that it risked an infringement suit.  First Quality could have elected to challenge the patents first before investing substantial resources in building a factory and purchasing equipment and machines to manufacture its competing product.

21

40.     The public interest would also favor granting an injunction if K-C was likely to succeed on the merits, since there is no critical public interest at risk that would outweigh the public's interest in promoting patent rights and the innovation and investment they encourages.  In sum, it is only concern over the validity of K-C's patents that prevents the Court from granting K-C's motion.

**ORDER**

41.     From the Court's conclusion that First Quality's invalidity defenses have substantial merit, it follows that K-C has failed to show it has a reasonable likelihood of success on the merits on its claims against First Quality.  K-C's motion for a preliminary injunction is therefore denied.

Dated this   11th   day of December, 2009.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

22