# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

KIMBERLY-CLARK WORLDWIDE, INC. and
KIMBERLY-CLARK GLOBAL SALES LLC,

        Plaintiffs,

      v.                                     Case No. 09-C-916

FIRST QUALITY BABY PRODUCTS, LLC, et al.,

        Defendants.

---

## CLAIM CONSTRUCTION ORDER

---

This patent infringement action is before the Court for claim construction following briefing and a *Markman* hearing. In the underlying action Plaintiffs Kimberly-Clark Worldwide, Inc., and Kimberly-Clark Global Sales, LLC, (collectively "K-C") claims that Defendants First Quality Baby Products, LLC, and First Quality Retail Sales, LLC (collectively "First Quality") have infringed various K-C patents relating to refastenable training pants and the process used to manufacture them. Though there are ten patents in suit, each containing multiple claims, the parties have agreed on many terms in need of construction and have asked the Court to resolve the disputes that remain over the following seventeen claim terms or phrases. Before addressing the disputed claim terms and phrases, I will first set forth the legal standards that must govern claim construction.

## I. Legal Standard Governing Claim Construction

A patent includes both a written description of the invention and claims. The written description, which usually includes figures, is often referred to as the "specification" of the patent.

The specification ends with one or more numbered sentences that are the patent's "claims." These claims describe the invention and set forth the metes and bounds of the patent.

Claim construction is an issue of law for the Court. If a material issue in the case, such as infringement or validity, involves a dispute about the meaning of certain claim language, the Court needs to construe that disputed claim language. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996). The only claim language that needs to be construed is the language "in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999).

Claim construction begins with and focuses on the words of the claim. *See Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.,* 55 F.3d 615, 619-20 (Fed. Cir. 1995). How a person of ordinary skill in the art understands those claim terms provides an objective baseline for claim construction. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). In attempting to determine the meaning of disputed claim language, the Court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* at 1314. "Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (internal quotation marks omitted). Extrinsic evidence includes sources such as the testimony of experts and knowledgeable technical witnesses, dictionaries, and learned treatises. *Id.* at 1317-18. Extrinsic evidence is "less significant" and "less reliable" than the intrinsic record in determining the meaning of the claim language. *Id.* Thus, to the extent that the Court considers

extrinsic evidence, it does so in the context of the intrinsic evidence and is cognizant of "the flaws inherent" in such evidence. *Id.* at 1319.

"The claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims" and is not limited "to his preferred embodiment" and the court will not "import a limitation from the specification into the claims." *Kara Tech. Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed. Cir. 2009); *Comaper Corp. v. Antec, Inc.,* 596 F.3d 1343, 1348 (Fed. Cir. 2010) (cautioning "against confining the claims to [preferred] embodiments[.]" ). Even where "a patent describes only a single embodiment, the claims should not be construed as limited to that embodiment" absent a clear disavowal of claim scope. *Phillips,* 415 F.3d at 1323; *see Linear Tech. Corp. v. ITC,* 566 F.3d 1049, 1057-58 (Fed. Cir. 2009) (explaining that it is improper to limit a claim to embodiments described in the specification where "there is no clear intention to limit the claim scope").

The Court may also consider the patent's prosecution history, including reexamination proceedings. *Phillips,* 415 F.3d at 1317. The prosecution history, which is part of the "intrinsic evidence," consists of the "complete record of the proceedings before the USPTO and includes the prior art cited during the examination of the patent." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The prosecution history includes any arguments or amendments made by the applicant in securing patent rights and these arguments and amendments may be considered during the claim construction process. *Southwall Techs. Inc. v.*

3

*Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir. 1995). The correct claim construction must be consistent with the arguments the applicant made to overcome a prior art rejection. *See id.*

## II. Claim Construction and Analysis

As a preliminary matter I adopt all of the "Agreed Constructions" as set forth in the parties' Joint Submission of Agreed and Disputed Claim Constructions. (Dkt. 328 at 2-4.) I now turn to the disputed constructions, which will be addressed sequentially below. For clarity and ease of reference, I have incorporated the claim chart submitted by K-C prior to the *Markman* hearing which sets forth the disputed claim language and the proposed constructions of the respective parties. I have added a column for the construction adopted by the Court.

### A. The '067 Patent

The '067 patents describes a disposable training pant with side seams that are easy to open and can be refastened. The parties have disputes over the meaning of three terms or phrases used in Claim 8.

#### 1. "refastenable pant"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| refastenable article capable of being pulled on and off over the hips like a pant and applied like a diaper | refastenable article capable of being repeatedly fastened, unfastened and refastened | an article capable of being repeatedly fastened and unfastened which, when fastened, can be pulled on and off over the hips like underwear briefs and, when unfastened, can be placed on a child and fastened like a diaper. |

Construction of the phrase "refastenable pant" requires definition of the words "refastenable" and "pant." First Quality's proposed construction omits entirely any definition of the word "pant" and instead substitutes the word "article." K-C's proposed construction is more appropriate, but I have added elements to bring greater clarity to both the term "refastenable" and "pant." Both words should be defined to provide clarity to the meaning of the phrase. I agree that the word "refastenable" means capable of being repeatedly fastened and unfastened. The word "pant" can be defined with greater specificity than the word "article" offers, however. "Pant" as used in the specification, means an article capable of being pulled on and off over the hips like underwear briefs. And when unfastened, it can be placed on a child and fastened like a diaper. Accordingly, the phrase "refastenable pant" is construed to mean "an article capable of being repeatedly fastened and unfastened which, when fastened, can be pulled on and off over the hips like underwear briefs and, when unfastened, can be placed on a child like a diaper." This construction is based on the plain meaning of the phrase and is supported by the specification.

### 2. "extending from the waist opening to each leg opening"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| extending substantially the entire distance between the waist opening and each leg opening | extending the entire distance between the waist opening and each leg opening | extending substantially the entire distance between the waist opening and each leg opening |

The relevant claim limitation describes "a pair of refastenable seams extending from the waist opening to each leg opening." ('067 patent, col. 23, lines12-15.) The parties' dispute is over whether the language "extending from the waist opening to each leg opening" means that seams

must extend the entire distance from the material that forms the waist opening of the pant down to the material that forms the leg opening, leaving no space between the end of the seam and waist and leg openings. First Quality argues that the plain meaning of the terms "from" and "to" clearly requires no space between the seams and the waist and leg openings. K-C, on the other hand, contends that the language should be construed as extending substantially the entire distance between the waist and each leg opening.

Literally speaking, the seam defines the waist opening and the leg opening. Where the seam stops, the opening begins. It thus would seem to follow that the seam necessarily would extend all the way from the waist opening to each leg opening. First Quality points out, however, that the claims define the waist and leg openings by reference to the side panels. The side panels are defined as "extending from the waist opening to each leg opening" ('067 patent, col. 23, lines 7-10), and thus, First Quality argues, the seam must extend over the same area. But read in context and in light of the specification, it is clear that the refastenable seams need not extend the entire distance between the waist opening and each leg opening. Indeed, the specification states unequivocally that what is intended is that the seams extend substantially the entire distance but need not touch the outer edge of the material that forms the waist and leg openings:

> The refastenable side seams desirably extend substantially the entire distance between the waist opening and leg openings when the fastening components are engaged. More specifically, the refastenable seams can cover about 80 to 100 percent, and particularly about 90 to about 98 percent, of the distance between the waist opening and each leg opening, which distance is measured parallel to the longitudinal axis.

('067 patent, col. 17, lines 32-38.) Moreover, in each of the figures in the specification that display it, the refastenable side seam does not extend the entire distance from the waist opening to each of

the leg openings. Thus, to adopt First Quality's construction would require the Court to read out of the claim not only the preferred embodiment but every embodiment depicted in the specification. As the Federal Circuit has repeatedly cautioned, such a construction "would 'rarely if ever [be] correct and would require highly persuasive evidentiary support.' " *Chimie v. PPG Industries, Inc.*, 402 F.3d 1371, 1373 (Fed. Cir. 2005) (quoting *Interactive Gift Express, Inc. v. Compuserve Inc.*, 231 F.3d 859, 876 (Fed. Cir. 2000), and *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)); *see also Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996).

First Quality argues that its narrower construction is also supported by the prosecution history of the '067 patent. First Quality contends that during the prosecution history K-C limited Claim 8 to only those seams that extend the full length from the waist opening to the leg opening. In support of its argument, First Quality notes that the patent examiner initially rejected the application which eventually became Claim 8 of the '067 patent as being unpatentable based on the combined teachings of U.S. Patent 5,846,262 to Sayama et al. ("Sayama") and U.S. Statutory Invention Registration No. H1674 to Ames et al. ("Ames"). Before the PTO K-C distinguished Sayama and Ames by noting that neither disclosed refastenable seams extending from the waist opening to the leg opening, but instead both disclosed fasteners for diapers that were "nowhere near the leg areas." First Quality argues from this history that K-C disclaimed from Claim 8 seams that are shorter than the full length extending from the waist opening to the leg opening.

Prosecution disclaimer only occurs, however, where the applicant makes "clear" and "unmistakable" arguments limiting the meaning of a claim term. *SanDisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1286-87 (Fed. Cir. 2005). An ambiguous statement cannot create a

7

disclaimer that limits claim terms. *Id.* at 1287. Here, the Court concludes that there was no disclaimer. K-C did not clearly and unmistakably limit the meaning of "from" and "to" in such a way as to preclude application to seams that do not abut the waist opening and the leg opening. Instead, K-C noted that in Sayama and Ames the fasteners were "no where near the leg openings." (Doc. #319, Decl. of Brian A. Comack, Ex. 4, '711 Prosecution, Paper No. 20, at 3-4.) This is not sufficient to disclaim the construction that the specification expressly favors and that K-C now urges. Accordingly, the disputed language is construed to mean "extending substantially the entire distance between the waist opening and each leg opening."

### 3. "partially encircle"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| circle part but not all of | ordinary and customary meaning | encircle part, but not all of |

The claim element at issue here is "a pair of elastomeric leg members which partially encircle each leg opening . . ." Because partially does not mean completely K-C's proposed construction is appropriate. *See Helmsderfer v. Bobrick Washroom Equip.,* 527 F.3d 1379, 1381-84 (Fed. Cir. 2008) (affirming the construction that "partially hidden from view" means "hidden from view to some extent but not totally hidden from view"); *McNeil-PPC, Inc. v. Bayer Corp.,* No. 99-4733, 2000 WL 1705392, at *14 (E.D. Pa. Nov. 8, 2000) ("Partially overlapping" means "extending over and covering part of, but not all of" a thing).

First Quality argues that because the claim uses the language "comprising" rather than "consisting" (or "consisting of"), "First Quality's construction is required by the intrinsic evidence

and the rules governing claim construction." (FQ's Br., Dkt. 319, at 22.)  In contrast to First

Quality's position, however, K-C's use of "comprising" early in the claim before listing the several

claim elements does not control the meaning of the "partially encircle" language that describes the

elastomeric leg members.  Instead, the word "comprising" simply means that if an infringer's

product includes all of the elements of the claim, and an additional element(s) as well, that product

still infringes the claim. *See The Gillette Co. v. Energizer Holdings, Inc.,* 405 F.3d 1367, 1371-72

(Fed. Cir. 2005) (analyzing the meaning of the word "comprising").  Accordingly, the phrase

"partially encircle" is construed to mean "encircle part, but not all of."

### B. '187 Patent

The '187 patent generally relates to methods for folding pants.  It has previously been the

subject of several preliminary injunction hearings in this Court.  The parties dispute the meaning

of five claim terms or phrases, beginning with the preamble to the claim.

### 1. "A method of folding pants" (preamble)

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| not a claim limitation | the preamble is a limitation | not a claim limitation |

The preamble to Claims 1 and 6 of the '187 patent reads "A method of folding pants,

comprising: . . . ."  First Quality argues that this language operates as a limitation on the claim.

In its view, the preamble states a necessary and defining aspect of the invention (folding) and

therefore the method steps in the '187 patent must either be preparatory steps necessary for folding

or occur during folding.  First Quality contends that the '187 patent's limitations do not relate to

manufacturing steps which occur *after* folding. (Dkt. 295 at 3.)  K-C, on the other hand, argues that a preamble is not a claim limitation and thus does not impose limitations on what is claimed.

The Federal Circuit has held that the preamble can limit a patent claim.  In *On Demand Machine Corp. v. Ingram Indus.,* 442 F.3d 1331 (Fed. Cir. 2006), the Court held that the preamble phrase "high speed manufacture of a single copy of a book" necessarily limited the claims of the patent in that case in that it stated the framework of the invention whose purpose was rapid single-copy printing of a customer's selected book.  In *Altruis, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1371-72 (Fed. Cir. 2003), on the other hand, the Court held the preamble language "gaining control prior to the normal boot sequence" did not limit the claim by requiring the "setting" step to come before the "booting normally" step because it was clear from the specification that "gaining control prior to the normal booting sequence" could be accomplished even if the setting step was not performed before the booting normally step.  Both cases relied upon the well settled principle that "if the body of the claim sets out the complete invention, and the preamble is not necessary to give life, meaning and vitality to the claim, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation."  *Id.* at 1371 (quoting *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002)); *On Demand*, 442 F.3d at 1343 ("In considering whether a preamble limits a claim, the preamble is analyzed to ascertain whether it states a necessary and defining aspect of the invention, or is simply an introduction to the general field of the claim.").  "Whether a preamble stating the purpose and context of the invention constitutes a limitation of the claimed process is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history."  *Applied Materials, Inc. v. Advanced*

*Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572-73, 40 USPQ2d 1481, 1488 (Fed. Cir. 1996).

Here, it is clear in light of the overall form of the claim and the invention as described in the specification that the language "a method of folding pants" is not a claim limitation. The title of the patent is "Folding and Manufacture of Pants," and the invention described is a method of folding the material used to manufacture the product in anticipation of, and preparatory to, aligning the fasteners on the respective side panels so that they can be joined together to produce, preassembled, the refastenable disposable training pant that the specification describes. Unlike the preamble in *On Demand,* the preamble here does not limit the '187 patent with words such as "high speed." Rather than state a necessary and defining aspect of the invention, the preamble to the pertinent claims here serves simply as "an introduction to the general field of the claim." *On Demand*, 442 F.3d at 1343. Put another way the purpose of the preamble "method of folding pants" is the same as the hypothetical preamble "manufacture of a single copy of a book." Both preambles introduce the general field of the claim. But adding the phrase "high speed" to either preamble could, in the correct context, limit the claim to the subject matter of the preamble. Here, without any such modifying phrase, and read in context, I conclude that the preamble does not limit the claim.

### 2. "first and second transport devices"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| at least two devices for transporting articles | a first device and a second device for transporting articles | a first and a second piece of equipment or mechanism that transports articles |

For purposes of claim construction the parties only disagree over whether the words "first and second" in the claim should be constructed as "a first and a second" or "at least two." On this

point First Quality has the better argument. The words clearly mean a first device and a second device. K-C's argument to the contrary is based on its concern that First Quality intends to limit the meaning of the term device to a single component of the transport devices, i.e., the conveyor belt. But the word "device," as used here, means "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." *Merriam-Webster's Collegiate Dictionary,* 317 (10th ed. 1999). Thus, a transport device would be a piece of equipment or mechanism designed to transport articles. The claim language references two such devices, "a first and second transport device," not at least two.

The inventors knew how to claim "at least two" when intended. Indeed, Claims 1 and 6 of the '187 patent include the step of "transporting a plurality of discrete articles" which indicates transporting at least two. *See Resqnet.com, Inc. v. Lansa, Inc.,* 346 F.3d 1374, 1382 (Fed. Cir. 2003) ("[T]he recitation of 'plurality' suggests the use of 'at least two.'"). It follows that, had the inventors intended their invention to be claimed the way K-C proposes, they would have said either "at least two" or used the words "a plurality." In light of the absence of such language in the claim I will not interject the words "at least two" into the construction, but will provide a definition of transport device.

### 3. "first and second vacuum rolls operatively associated with the respective first and second transport devices"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| at least two vacuum rolls function in combination with "first and second transport devices" | two vacuum rolls, each of which are associated with and operate in combination with the respective first and second transport devices. | two vacuum rolls, each of which operates or functions in combination with the respective first and second transport devices |

Here K-C again includes the words "at least two" in its proposed construction. For the same reasons detailed above I will not construct "first and second vacuum rolls" as "at least two vacuum rolls." First Quality's construction is supported by the plain meaning of the language.

The parties also differ over how the relationship between the first and second vacuum rolls and the first and second transport devices should be defined. K-C wants to substitute the phrase "function in combination with" for the phrase "operatively associated." First Quality, on the other hand, believes that associated connotes a closer connection between the two components than functioning in combination does. In the Court's view, neither phrase conveys the degree of precision the parties dispute would suggest. In *St. Jude Medical, Inc. v. Access Closure, Inc.*, No. 4:08-cv-04101, 2010 WL 2868507, *7 (W.D. Ark. July 19, 2010), the Court construed the same language to mean "function in combination with." The Court agrees that this language most clearly defines the relationship between the vacuum rolls and the first and second transport devices.

### 4. "interposing separation members between the first and second transport devices"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| placing members between "first and second transport devices" that maintain the separation of the side panels | placing members that maintain the separation of the side panels during folding between the first and second transport devices. | placing members between the first and second transport devices that maintain the separation of the side panels |

The only significant difference between the parties' proposed constructions here is that First Quality seeks to adds the words "during folding" to limit the location of the separation members to

13

the place where the folding takes place. First Quality's argument in favor of this construction is based on its reading of the preamble to the claim as a claim limitation. For the reasons already stated, the Court does not read the preamble as a claim limitation. Accordingly, First Quality's proposed construction is rejected.

**5. "the leading and trailing side panels outstretched in a cross machine direction"**

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| the leading and trailing side panels are extended in a direction generally perpendicular to the machine direction | the leading and trailing side panels are fully extended in a direction generally perpendicular to the machine direction | the leading and trailing side panels are stretched out or extended in a direction generally perpendicular to the machine direction |

Here I am not satisfied that either of the proposed constructions give proper meaning to the disputed claim language. On one hand K-C argues that outstretched simply means "extended." First Quality, in contrast, argues that outstretched should mean "fully extended." The claim language, specification, and prosecution history do not shed adequate light on how to interpret the word outstretched beyond its ordinary meaning. The word outstretch means "to stretch out." *Merriam Webster's Collegiate Dictionary*, 827 (10th ed. 1999). I accept that simple and clear definition and incorporate it into the claim construction.

**C. '143 Patent**

The '143 patent relates to methods for inspecting an engagement seam of a refastenable training pant. Four terms are in dispute.

### 1. "pre-fastened disposable pants"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| disposable pants containing refastenable fastening components connected during manufacture | disposable pants containing components connected during manufacture | disposable pants the side panels of which are fastened or connected during manufacture and prior to sale |

Although I previously construed the phrase "pre-fastened disposable pants" as used in the '143 patent to mean disposable pants containing refastenable fastening components connected during manufacture, I am no longer convinced that this construction is correct. The word "pre-fastened" does not connote that the article to which it refers must also be refastenable. The permanently bonded training pants that K-C's "easy open pull-ups" were intended to improve on are also pre-fastened, that is, fastened before they are sold. While the phrase "pre-fastened disposable training pants" could include refastenable disposable training pants that are fastened in the course of the manufacturing process, the plain meaning of the term is not limited to the refastenable article. And as K-C has noted in connection with several other disputed claims, it is improper to read into the claim language limitations found only in the embodiments described in the specification. *See Intervet America, Inc. v. Kee-Vet Laboratories, Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) ("[T]his court has consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'") (quoting *E.I. Du Pont De Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).

In fact, however, the specification of the '143 patent also makes clear that the invention claimed is not limited to refastenable articles. The specification states that "the methods and apparatus of the present invention can be used to make articles in which at least two elements of the article can be connected together during the making thereof to assemble or 'prefasten' the article." ('143 patent, col. 9, lines 4-8.) Although the specification states that "the methods and apparatus [of the present invention] will be described in terms of those for making pre-fastened disposable training pants as described in U.S. patent application Ser. No. 09/444,083, U.S. Pat. No. 6,761,711 titled 'Absorbent Articles With Refastenable Side Seams'," it does not disclaim application to similar articles with permanently bonded side seams. Indeed, the specification notes that training pants can be manufactured using other methods and expressly incorporates a U.S. Patent No. 4,940,464 (Van Gompel), which teaches permanently bonded side seams. ('143 patent, col. 9, lines 11-23.) This point is made express further on as the specification describes the training pants that the invention claimed is intended to inspect: "The front and back side panels 34 and 134 can be permanently bonded together or be releasably connected with one another such as by the fastening system 80 of the illustrated embodiment." ('143 patent, col. 14, lines 54-57.)

In fact, the specification makes clear that the claimed invention is not even limited to disposable garments:

> Also, the methods and apparatus in the present invention are shown and described herein in connection with making a pair of child's training pants 20 and inspecting an engagement seam 88 thereof. However, it is understood that the methods and apparatus can be used to make and inspect a variety of articles other than pants 20 where such articles comprise at least two flexible elements connected together during the making of such articles in overlapping relationship with other to define an engagement seam as long as the article has an interior space bounded in part by the engagement seam. Such articles may include other disposable garments such as diapers, feminine hygiene products, incontinence products, other personal care or health care garments, swim pants, athletic clothing, pants and shorts, as well as other articles, such as balloons, tents, sleeves, cigarette packages, bags, and the like,

whether such articles are disposable or not and whether such articles are absorbent or not.

('143 patent, col. 42, lines15-32.)

In light of the plain meaning of the claim terms and the specification, I reject K-C's construction of the phrase "pre-fastened disposable pants."

### 2. "engagement seam"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| seam formed when the respective fastening components of the front and back side panels of the pant are aligned and connected together. | seam formed where the front and back side panels are connected together | seam formed where the front and back side panels are connected together |

Here, too, I conclude that First Quality has the better argument. K-C seeks to import into its construction of the phrase "engagement seam" the concept of fastening components which the specification notes "can comprise any refastenable fasteners suitable for absorbent articles, such as adhesive fasteners, cohesive fasteners, mechanical fasteners, or the like." ('143 patent, col. 16, lines 13-15.) Certainly, the phrase "engagement seam" would include a seam formed when the respective fastening components of the front and back side panels are aligned and connected together, but is it so limited? First Quality's proposed construction would include any seam formed where the side panels are joined, whether there are refastenable fastening components or not. As First Quality points out, none of the claims use the term "fastening components," and the term "engagement seam" is not among the terms explicitly defined in the specification.

A careful reading of the specification supports First Quality's proposed construction. The specification uses the phrase "engagement seam" to refer both to seams formed where the respective

refastenable fastening components of the front and back side panels are "aligned and connected together," ('143 Patent, col. 1, lines 44-45), and those formed without refastenable fastening components. For example, in describing the benefit of the claimed invention over an earlier patent, the specification notes:

> Although highly useful for many applications, the inspection system disclosed in the aforementioned patent has certain shortcomings with respect to the inspection of engagement seams formed by connecting two elements together such that the engagement seam is essentially two layers. For example, engagement seams formed by connected side panels of the training pants described previously has heretofore entailed connecting the side panels in face-to-face relationships with outer edges of the side panels aligned with each other. To inspect such an engagement seam, it was necessary only to inspect the exposed outer edges of the side panels so that there was no need to actually capture an image of any underlying elements or edges of the training pants.

('143 Patent, col. 2, lines 20-32.) Since the inventors used the phrase "engagement seam" to refer to seams that were not formed by connecting refastenable fastening components, I decline to adopt K-C's construction.

### 3. "inspecting the engagement seam"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| capturing an image of the engagement seam | inspecting an image of the engagement seam | capturing an image of the engagement seam |

The word "inspection" means "to examine, scrutinize, investigate, look into, check over; or view for the purpose of ascertaining quality. .." *Blacks's Law Dictionary,* 797 (6th ed. 1990). Thus, at first blush, the term "inspecting the engagement seam" would seem to indicate more than merely "capturing an image;" it would seem to require at least some degree of analysis. But in the realm of patent litigation the plain meaning of a word or phrase does not always control. A "patentee may

18

act as a lexicographer and ascribe a different, or modified meaning to the term." *Hockerson-Halberstadt, Inc., v. Avia Grp. Int'l, Inc.* 222 F.3d 951, 955 (Fed. Cir. 2000.) To do so the patentee need not provide an explicit definition of a word in the patent; rather, when "a patentee uses a claim term through the entire patent specification, in a manner consistent with only a single meaning, he has defined that word by 'by implication.'" *Bell Atl. Network Servs. Inc. v. Covad Commc'ns Grp., Inc.,* 262 F.3d 1258 (Fed Cir. 2001) (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996). The Federal Circuit has made clear that inventors can give terms special definitions, and those special definitions can be based on the context of the specification and need not be express. *Astrazenica LP v. Apotex, Inc.,* No 2010-1381, --- F.3d ---, 2010 WL 4286284, at *7 (Fed. Cir. Nov. 1, 2010)("The specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs . . . . The specification need not reveal such a definition explicitly. . . . When a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term by implication.") (citations and internal quotation marks omitted). Here the patentee did just that. He referred repeatedly to inspecting the engagement seam as capturing an image ('143 patent, col. 49, lines 58-61; col. 2, lines 6-9.) For example: "[t]he inspection system also comprises an image capturing device operable to capture an image of the irradiated engagement seam . . . ." (*Id.,* col. 4, lines 6-9.) The patentee makes numerous references to capturing an image (*id.* col 35, lines 1-3; col. 39, lines 61-64) in the patent but describes analysis as occurring in a separate patent. (*Id.* cols. 39-40.) This confirms K-C's construction that inspecting the engagement seam can be properly constructed as "capturing" the engagement seam for purposes of the '143 patent.

19

First Quality argues that the doctrine of claim differentiation prohibits K-C's construction because it would make an additional limitation in Claim 71 meaningless in light of Claim 63. (Resp. Br., Dkt. 319 at 47.) But Claim 71 does not merely add "capturing an image of the engagement seam." Rather, Claim 71 requires that capturing an image of the engagement seam (i.e., "inspecting" the seam) happens when the product is placed in a particular orientation; namely, when the engagement seam is urged "to lay generally flat on the support member." Thus Claim 71 adds additional limitations beyond "capturing an image of the engagement seam." Because the full context of dependent Claim 71 reveals that it is not wholly redundant of independent claim 63, the doctrine of claim differentiation cannot apply. *See Enzo Biochem, Inc. v. Applera Corp.,* 599 F.3d 1325, 1342 (Fed. Cir. 2010)

### 4. "pulling the front and back side panels in generally opposite directions to tension the side panels at the engagement seam"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| applying a pulling force to the front side panel and applying an opposite pulling force to the back side panel to tension the side panels at the engagement seam | ordinary and customary meaning | pulling the front and back side panels in generally opposite directions to tension the side panels at the engagement seam |

I am unpersuaded that this disputed claim language requires additional construction beyond its ordinary and customary meaning. The original terms are understandable and K-C's proposed construction does not clarify the plain and ordinary meaning of the words or resolve any dispute between the parties over its meaning. First Quality argues that K-C's proposed construction improperly attempts to import limitations, specifically, fastening components, from the

20

specification. Although I do not find this to be true, I see no reason to adopt K-C's proposed construction since it provides no benefit over the claim language itself.

### D. '939 Patent

The '939 patent generally relates to tucking the side panels into a garment and generating a shear stress at the engagement seam to help prevent the seam from separating accidentally when the garment is used. Only one term is in dispute.

### 1. "shear stress"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| force generally parallel to the face of the material and pulling in an opposite direction | a force generally parallel to the face of the material | force generally parallel to the face of the material |

First Quality argues that "pulling in an opposite direction" is just one of many ways to create a "shear stress" as explained by the '939 patent. (Resp. Br., Dkt. 319, at 53). First Quality is correct. The specification makes clear that shear force can be generated in ways other than pulling the material in opposite directions: "It is also understood that the shear stress applied to the engagement seam 88 may alternatively, or may additionally, be generated in the machine direction (e.g., longitudinally) in which the training pants are transported through the seaming section, such as by applying a longitudinally oriented force (e.g., pulling, friction, etc.) to one of the fastening components 82, 84, or by applying longitudinally opposite forces to the fastening components." ('939 Patent, col. 34, lines 11-18.) K-C's proposed construction would improperly limit the manner in which shear force could be created to pulling the material in opposite directions.

The fact that First Quality's expert agreed that shear force would be created by pulling material in opposite directions does not support K-C's proposed construction. He did not testify that pulling the material in opposite directions was the only way a shear force could be generated at the engagement seam. Accordingly, it would be error to limit the meaning of the phrase as K-C proposes.

### E.  '119 Patent

The '119 patent relates to a disposable absorbent article including wetness indicating graphics that act as an interactive aid for toilet training and that can help motivate a child to become toilet trained. One phrase is in dispute here.

### 1.  "active object graphic

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| graphic representing an object or thing, which can include an inanimate object or character, that is an appearing graphic, a fading graphic or a combination of appearing and fading graphics | graphic representing an object or thing (not an anthropomorphous image), which can include an inanimate object or alphanumeric character, that is an appearing graphic, a fading graphic or a combination of appearing and fading graphics | graphic representing an object or thing, which can include an inanimate object or character, that is an appearing graphic, a fading graphic or a combination of appearing and fading graphics |

K-C's construction is supported by the '119 patent's specification. The terms "active graphic" and "object graphic" are both defined in the '119 patent. ('119 patent, col. 2, lines 26-28; col. 4, lines 63-65.)   The specification explains that "[t]he term 'active graphic' as used herein refers to an appearing graphic, a fading graphic, or a combination of appearing and fading graphics."

('119 patent, col. 2, lines 25-27.) The specification also explains that the "term 'object graphic' is used herein to refer to a graphic representing an object or thing, which can include an inanimate object or a character." (*Id.* at col. 4, lines 63-65.) K-C arrives at its proposed construction by combining these two explanations. I am not persuaded that the specification language or the prosecution history would limit the term "active object graphic" to the extent First Quality proposes – specifically there is no good reason to construe "active object graphic" in such a way to exclude it from being an "anthropomorphous image."

### F. '374 Patent

The '374 patent generally discloses a method for making prefastened and refastenable pants using "activatable retractive material" in the waistband. The patent aims to balance two goals that are seemingly at odds: (1) producing a snug fitting pant and (2) avoiding the manufacturing headache of dealing with retractive material throughout the entire assembly process. Keeping the pants from retracting (becoming snug) until the end of the manufacturing process makes them easier to work with, manipulate, and control by machines in a high speed process.

### 1. "activatable retractive material"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| material that retracts based on applying a mechanism to the material such as energy, electromagnetic radiation, compaction, or compression, or removal of such a mechanism from the material | a material that is not elastic but can be transformed into a material that is elastic | material that retracts based on applying a mechanism to the material such as energy, electromagnetic radiation, compaction, or compression, or removal of such a mechanism from the material |

First Quality's proposed construction improperly adds limitations into the claims. First Quality's proposed construction would limit "activatable retractive material" to only the use of a material that is "transformed" from a non-elastic material to an "elastic" material. But neither the specification nor the claim limits the "activatable retractive material" in such a manner. To the contrary, the '374 patent specification clearly teaches that the "retractive material can comprise <u>any material</u> adapted to retract upon activation," and that the "retractive material can comprise elastomeric or nonelastomeric materials." ('374 patent, col. 4, lines 34-37) (emphasis added).

The '374 patent also specifically defines the terms "elastic," "elasticized," and "elasticity." (*Id.*, col. 8, lines 22-25.) If the claim covered only material that could be transformed from not elastic to elastic (or elasticized), it would have used one of those specific terms, rather than the more general term "activatable retractive material," which, as the specification makes clear, may be either an elastomeric or nonelastomeric material. (*Id.*, col. 4, lines 34-37.)

## 2. "activating at least a portion of the retractive material"

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| applying a mechanism to at least a portion of the retractive material such as energy, electromagnetic radiation, compaction, or compression, or removal of such a mechanism from at least a portion of the retractive material | transforming at least a portion of the material from a state that is not elastic to a state that is elastic | applying a mechanism to at least a portion of the retractive material such as energy, electromagnetic radiation, compaction, or compression, or removal of such a mechanism from at least a portion of the retractive material |

Here the disputed claim language will be constructed as proposed by K-C for the same reasons set forth in the preceding section related to "activatable retractive material."

24

### G. Order of the Steps

| K-C's Proposed Construction | First Quality's Proposed Construction | Court's Construction |
|---|---|---|
| Steps [f] and [g] must be performed in the order written. Steps [e] and [f] can be performed in any order. | The following steps in Claim 9 must be performed in the order that they are recited: [e] folding each article through the crotch region; [f] folding the opposed side panels to overlap at least portions of the first and second fastening components; [g] engaging the first and second fastening components | The following steps in Claim 9 must be performed in the order that they are recited: [e] folding each article through the crotch region; [f] folding the opposed side panels to overlap at least portions of the first and second fastening components; [g] engaging the first and second fastening components |

The '374 patent does not specifically state that the steps in the manufacturing process occur in a certain order. Whether a method claim requires that its steps be performed in sequential order is a question of claim interpretation. *See, e.g., Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.,* 152 F.3d 1368, 1375-76 (Fed. Cir. 1998). A method claim should be interpreted to require that its steps be performed in sequence if "logic or grammar, requires that the steps be performed in the order written." *TALtech Ltd. v. Esquel Apparel, Inc.,* 279 Fed. Appx. 974, 978 (Fed. Cir. 2008). Here not only are the steps presented one after another – which may indicate an order or sequence – but logic dictates that folding the pants through the crotch must occur before "folding the opposed side panels to overlap at least portions of the first and second fastening components." At the hearing K-C successfully demonstrated that it was possible to fold the opposed side panels before making a fold in the crotch but K-C could not show that it was possible to fold the opposed side panels to overlap at least portions of the first and second fastening components prior to making a

fold in the crotch.  For this reason both logic and grammar require that the steps be performed in order as recited by First Quality's proposed construction.

## III.  Conclusion

The disputed claim language is constructed as noted in the far right hand column of each above chart for the reasons set forth above.

Dated this __19th__ day of January, 2011.

  s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge