UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KIMBERLY-CLARK WORLDWIDE, INC., and
KIMBERLY-CLARK GLOBAL SALES, LLC,

      Plaintiff,

v.

FIRST QUALITY BABY PRODUCTS, LLC, and
FIRST QUALITY RETAIL SALES, LLC,`

      Defendant.

Case No. 10-C-1118
(consolidated with 09-C-916)

# DECISION AND ORDER

Plaintiffs Kimberly-Clark Worldwide, Inc., and Kimberly-Clark Global Sales, LLC (K-C) sued Defendants First Quality Baby Products, LLC and First Quality Retail Sales, LLC (First Quality) for infringement of a K-C patent relating to the manufacture of one of its products. K-C and First Quality are competitors in the disposable training pants market. Both manufacture and sell disposable training pants with refastenable side-seams, which K-C first developed and mass produced for the retail market. K-C was granted a number of patents that relate to not only the product itself but also the manufacturing process K-C developed in its effort to make the product a commercial success. At issue here is U.S. Patent No. 6,885,451 ("the '451 Patent"), which teaches a system and process for inspecting the engagement seam that is formed when the refastenable training pants are pre-fastened during the manufacturing process. K-C claims that the inspection system used by First Quality in its manufacturing process infringes on K-C's '451 Patent.

First Quality denies that its inspection system infringes the '451 Patent. First Quality further contends that to the extent its inspection system does infringe the '451 Patent, the claims its system allegedly infringes are invalid under 35 U.S.C. § 102(b) because they are anticipated by prior art. The case is before the Court on cross motions for summary judgment seeking a determination of the validity of the claims at issue. For the reasons set forth herein, First Quality's motion for summary judgment, Docket 532, will be granted and K-C's motion for summary judgment, Docket 454, will be denied.

## BACKGROUND

The '451 patent teaches a system or process for inspecting a composite article by detecting the location of edges of components that are located underneath other components. Although the process is described in the specification in connection with making pre-fastened children's training pants, the specification also makes clear that "the methods and apparatus of the present invention can be used to make articles in which at least two elements of the article are connected together during the making thereof to assemble or 'pre-fasten' the article." ('451 Patent, col. 4, l. 35-45.) In general, the process determines whether the various components of a composite article are present and/or properly positioned by irradiating with visible, ultraviolet, or infrared light an area of the composite article where the components overlap. An image capturing device, such as a camera, located on the opposite side of the article produces a two-dimensional image from the radiation passing through the composite article which shows the position of one or more overlapping components in relation to each other. ('451 Patent, col. 15, ll. 21-25.) The image is then compared to predetermined data showing the ideal position of the components to determine

whether the components are present and properly positioned. ('451 Patent, Summary of Invention, col. 2, l. 5 to col. 3, l. 38.)

The focus of the present dispute between the parties centers on independent Claims 1 and 9 of the '451 Patent, which read as follows:

> 1.   A process of inspecting a composite article having first and second panels in at least partially opposed, overlapping engagement with each other, the first panel having an underlying edge overlapped by at least a portion of the second panel which is substantially opaque to visible and/or ultraviolet light, said process to determine whether the panels of the article are present and/or properly positioned, said process comprising:
>
> > irradiating the overlapping engagement of the panels with radiation;
> >
> > producing an image from radiation received from the irradiated panels; and
> >
> > identifying in the image a position of the underlying edge; and
> >
> > comparing the identified position of the underlying edge with a predetermined data to thereby determine whether the underlying edge is present and/or properly positioned in the composite article.
>
> * * *
>
> 9.   A system for inspecting a composite article having first and second panels in at least partially opposed, overlapping engagement with each other, the first panel having an underlying edge overlapped by at least a portion of the second panel which is substantially opaque to visible and/or ultraviolet light, said system for determining whether the panels of the article are present and/or properly positioned, said process comprising:
>
> > a radiation source for irradiating the overlapping engagement of the panels with radiation;
> >
> > a detector for producing an image from radiation received from the irradiated panels; and
> >
> > an image analyzer operatively connected to the detector for identifying in the image a presence and/or position of the underlying edge and for comparing

> the identified presence and/or position of the underlying edge with a predetermined data to thereby determine whether the underlying edge is present and/or properly positioned in the composite article.

('451 Patent, col. 23, l. 52 to col. 24, l. 2; col 24, ll. 27-46.)

The application that resulted in the '451 Patent included Application Claims 1 and 9 which, after amendment, issued as Claims 1 and 9 of the '451 Patent set forth above. As originally filed, however, Application Claims 1 and 9 did not include the limitation "the first panel having an underlying edge overlapped by at least a portion of the second panel which is substantially opaque to visible and/or ultraviolet light." This limitation was added after the Examiner initially disallowed Application Claims 1 and 9 and several additional claims that depended from them. The Claims were disallowed as being anticipated under 35 U.S.C. § 102(b) by U.S. Patent No. 539,525 (hereinafter "the '525 Patent" or "Weyenberg"), which the inventors had disclosed in their application.

Weyenberg teaches a method or apparatus for sequentially inspecting composite products, such as disposable absorbent articles, along an assembly line to determine the position of selected component elements within each inspected product. The inspection is accomplished by making a two-dimensional image of a product using visible or ultraviolet light and comparing the location of the component shown in the image to a respective predetermined location of the component to determine any variance between the actual location and desired location. ('525 Patent, col. 10, ll. 17-40.)

In disallowing the claims, the examiner noted that "Weyenberg discloses a system for controlling the inspection of composite articles, such as disposable absorbent articles, said articles

4

having multiple overlapping panel components." (ECF No. 457, Butterworth Decl., Ex. B (Part 1), June 4, 2004 Office Action, 3). More specifically, the examiner observed:

> Weyenberg discloses irradiating the overlapping engagement of the composite article with lighting means 44 and 45, and imaging the article with camera detector 43 (Fig. 1). Weyenberg discloses that the images are processed by an image analyzer 46 and transmitted to a comparator 61, to determine the desired position of the component edge location with respect to the desired configuration and predetermined tolerance range. (col. 6, lns. 25-36).

(*Id.*)

The inventors responded to the June 4, 2004 Office Action by amending independent Application Claims 1 and 9 to require further that the overlapping second panel be "substantially opaque to visible and/or ultraviolet light." (*Id.* at Sept. 3, 2004 Amendment A at 2–3.) This was the only new aspect of the amended claims. The inventors argued before the examiner that the amendments to Application Claims 1 and 9 overcame the disallowance because the inspection system disclosed in Weyenberg would not work on materials that were substantially opaque to visible and/or ultraviolet light:

> Regarding claims 1 and 9, the Examiner argues that the Weyenberg reference teaches or suggests each and every element. Applicants respectfully disagree. In particular, claims 1 and 9 have been amended to recite identifying in an image a presence and/or position of a *first panel's underlying edge overlapped by at least a portion of a second panel which is substantially opaque to visible and /or ultraviolet light*. Even though the Weyenberg reference teaches "establish[ing] the location of at least one edge of at least one of the said selected components" (Weyenberg, claim 1), it fails to teach or suggest that a presence and/or position of a first panel's underlying edge overlapped by a least a portion of a second panel which is substantially opaque to visible and/or ultraviolet light may be identified, as recited in amended claims 1 and 9.

(*Id.*)

5

The Examiner agreed and allowed the amended claims to proceed, apparently under the assumption that the radiation referred to in Claims 1 and 9 was not limited to visible and/or ultraviolet light but also included infrared radiation. Several other claims in the application explicitly referred to infrared radiation, which can penetrate material that is substantially opaque to visible and/or ultraviolet light. In his Notice of Allowability, the examiner explained:

> Referring to Claim 1, the prior art references, either considered alone or in combination, do not disclose or render obvious the limitations whereby a process for inspecting a composite article having first and second panels in at least partially opposed overlapping engagement with each other, the first panel having an underlying edge overlapped by at least a portion of a second component which is substantially opaque to visible and/or ultraviolet light comprises, said process comprising irradiating the overlapping engagement with infrared radiation, producing an image from infrared radiation received from the irradiated panels, identifying in the image a position of the underlying edge, in combination with the remaining limitations in the claim.

(Id. at Nov. 8, 2004 Notice of Allowability.)

On November 29, 2004, the inventors filed a Response to Examiner's Statements of Reasons for Allowance, in which the inventors noted "some errors" in the Examiner's Statement. (K-C's Ex. B (Part 1), Nov. 29 2004 Response 1). In this Response, the inventors corrected certain misstatements and typographical errors the Examiner made in reciting the limitations of certain un-asserted claims. (*Id.* at 1–2.) As First Quality emphasizes, however, the inventors did not mention any of the errors or misstatements in the Examiner's statement of reasons that it asserts before the Court today. (*Id.* at 1–2; ECF No. 489 at 13.) In particular, the inventors did not argue that the examiner had erred in disallowing the claims absent the "substantially opaque to visible and/or ultraviolet light" limitation or in reading into the amended claims the use of infrared radiation.

6

On September 21, 2009, K-C brought this suit against First Quality, alleging infringement Claims 1, 9, and several dependent claims of the '451 Patent. First Quality countered with a motion for Rule 11 sanctions on January 20, 2011, arguing K-C's infringement assertion of the '451 Patent was legally unreasonable and objectively baseless because First Quality's inspection system did not use infrared radiation. In response to First Quality's motion, K-C argued that, notwithstanding the suggestion in the Notice of Allowance by the Patent Examiner, Claims 1 and 9 were not limited to systems using infrared radiation. The Court agreed, noting that dependent claims 2 and 10 expressly added infrared radiation, thereby demonstrating that independent Claims 1 and 9 did not already include such a limitation. The Court therefore denied First Quality's Rule 11 Motion on the ground that K-C's infringement allegation was not unreasonable. At the same time, however, the Court expressed serious concern as to the validity of Claims 1 and 9 of the '451 Patent in light of Weyenberg since they did not require the use of infrared radiation. (ECF No. 45.) In response to that Order, the parties respectively moved for summary judgment to determine the validity of Claims 1 and 9 of the '451 Patent.

**DISCUSSION**

**1. Summary judgment standard**

The court is required to grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 447 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460–61 (E.D. Wis.1991). "Material facts" are those under the applicable substantive law that "might affect

the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

**2. Anticipation and claim construction**

A patent or claim thereof is invalid if it is anticipated in the prior art. Anticipated in the prior art means that the patent or claim "was ... described in a printed publication in this ... country ... more than one year prior to the date of application for patent in the United States." 35 U.S.C. § 102(b). Determining whether a patent is anticipated is a two-step analysis. First, the Court construes disputed claim terms to determine their scope and meaning. Claim construction is a question of law to be decided by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claim construction begins with and focuses on the words of the claim. *See Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619–20 (Fed. Cir. 1995). There is a "heavy presumption" that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In attempting to determine the meaning of disputed claim language, the court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean. . . . includ[ing] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips v. AWH Corp.*, 415 F.2d 1303, 1312–114 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted).

In construing claims, a patentee is not confined to the ordinary meaning of claim terms but is free to create words, define terms in a way different from the ordinary meaning, or modify the ordinary meaning. *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990). In these circumstances, the meaning assigned by the patentee to claim terms should be used to construe those terms. *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.2d 1358, 1361 (Fed. Cir. 2007) ("When a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term.").

In the second step in determining the patent's validity, the construed claims are compared to the prior art. *See Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992). "Anticipation is a question of fact, but may be decided on summary judgment if there is no genuine issue of material fact." *Syringe Development Partners LLC v. New Med. Tech., Inc.*, No. IP98-1726, 2001 WL 403232, at *16 (S.D. Ind. Feb. 9, 2001). "Anticipation requires that 'all aspects of the claimed invention were already described in a single reference.'" *First Years. Inc. v. Munchkin, Inc.*, 575 F. Supp. 2d 1002, 1025 (W.D. Wis. 2008) (citing *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576–77 (Fed. Cir. 1991)).

Because each claim of a patent is presumed to be valid, *see* U.S.C. § 282, an accused infringer must prove anticipation by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd.*, 131 S. Ct. 2238, 2242 (2011). "This burden is 'especially difficult' when . . . the infringer attempts to rely on prior art that was before the patent examiner during prosecution." *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004).

With these principles in mind, the Court now turns to First Quality's challenge to the validity of the '451 Patent.

9

**3. Claims 1 and 9 are anticipated by Weyenberg**

First Quality contends that Claims 1 and 9 of the '451 Patent are invalid as anticipated because every limitation contained therein is disclosed in Weyenberg. First Quality argues that Claims 1 and 9 disclose an inspection system for checking the positions of various components of a composite article just as Weyenberg. Both Weyenberg and the disputed claims use visible or ultraviolet radiation to irradiate the overlapping components to create an image that is then compared with predetermined data showing the ideal location of the components. If, as K-C argues and the Court has found, Claims 1 and 9 do not require the use of infrared radiation, then Weyenberg clearly anticipates those claims and they must be found invalid.

K-C argues in support of its motion that Claims 1 and 9 are not invalid because they contain two limitations that are not found in Weyenberg. Both limitations are found in the following language that is contained in both of the disputed claims: "first and second panels in at least partially opposed, overlapping engagement with each other." K-C argues that the term "panel" has a narrower meaning than the term "component" used in Weyenberg. First and second panels, as K-C understands the phrase, means "first and second portions of material that extends outward from the chasis." (Dkt No. 529 at 11.) First and second panels "in at least partially opposed, overlapping engagement with each other" means, according to K-C, that the first and second portions of material that extend outward from the chassis are "connected with each other such that they are positioned at least partially opposite each other, and at least partially overlapping each other." (*Id.* at 12-13.) Because Weyenberg does not disclose panels, so defined, that must be connected with each other such that they are positioned at least partially opposite each other and at least partially overlapping each other, K-C contends it does not anticipate Claims 1 and 9 of the '451 Patent.

10

In essence, K-C's proposed construction simply reflects the fact that it incorporated into Claims 1 and 9 the specific article the inventors used to describe their invention, namely pre-fastened children's training pants. First Quality is correct that the plain meaning of the word "panel" is "a piece of cloth" or "a separate or distinct part of a surface." Merriam-Webster's Collegiate Dictionary, 839 (10th ed. 1999). And nothing in the plain meaning of the term suggests that the panels must extend outward or be oriented in a particular way to an absorbable chassis or any chassis. At the same time, the requirement that the panels be "in at least partially opposed, overlapping engagement with each other" would seem to require that the material that comprises the panels "extend outward" from the body or "chassis" of the article so that they can be placed "in at least partially opposed, overlapping engagement with each other." Given these considerations and the manner in which the panels are described and depicted in the specification, K-C's construction does not seem unreasonable. But that is only half the analysis. The second step requires that construed claims be compared with the claims in the prior art.

K-C is correct that Weyenberg does not specifically disclose a process for inspecting a composite article with side panels that are connected with each other such that they are positioned at least partially opposite each other, and at least partially overlapping each other. Instead, Weyenberg describes a process for inspecting the location of overlapping components of a composite article. ('525 Patent, col. 10, ll. 25-34.) The language of Weyenberg, as K-C concedes, is broader than the language of Claims 1 and 9, and includes the components that those claims describe. The first and second panels in Claims 1 and 9 of the '451 Patent are simply components of the composite article disclosed in Weyenberg, and like Weyenberg, Claims 1 and 9 describe a process for inspecting the position of those components within the composite article. Thus, the

11

invention claimed in Weyenberg encompasses Claims 1 and 4 of the '451 patent and therefore anticipates them.

Ultimately, however, the parties' dispute over the meaning of these terms and phrases is a side issue. The '451 Patent, like Weyenberg, is a method or process patent. Both disclose a method or process for inspecting composite articles, such as disposable absorbent articles, during manufacture or assembly. The process described in Claims 1 and 9 of the '451 Patent, to the extent only visible or ultraviolet light is used, is identical to the process claimed by Weyenberg. Both use visible or ultraviolet radiation to determine the position of the various components of the composite article being assembled. The claim terms that are in dispute relate not to the process or method claimed, but to the particular portion of the article being inspected. In other words, Claims 1 and 9 of the '451 Patent at best disclose not a new method of inspection but a new use of the method already disclosed in Weyenberg. And since it involves a closely related product, it is a use that would have been obvious to one skilled in the art. Instead of checking the position of the various components of other kinds of "disposable absorbent articles such as diapers, incontinence devices, sanitary napkins, and the like" (Weyenberg, col. 1, ll. 23-24), Claims 1 and 9 teach the use of the same process to check the respective positions of the side panels that are joined together during manufacture of articles such as K-C's pre-fastened training pants.

It has long been established that a new and slightly different use of a previously patented process is not itself patentable. *See Triangle Conduit & Cable Co. v. National Electric Products Corp.*, 149 F.2d 87, 90 (3rd Cir. 1945) ("The application of an old patent to a new use is not patentable."); *Scott Paper Co. v. Fort Howard Paper Co.*, 432 F.2d 1198, 1203 (7th Cir. 1970) ("The record supports the district court's conclusion that the Scott patent has merely adapted an old

12

method to a new use by modifications obvious to one skilled in the art, which does not constitute a patentable invention."). To hold otherwise would open the door to countless applications for patents that would ill serve the purpose underlying the law creating such a right.

The inventors apparently recognized as much when they amended Claims 1 and 9 to overcome the Examiner's initial disallowance. Despite the fact that Application Claims 1 and 9 already required that the "first and second panels [be] in at least partially opposed, overlapping engagement with each other," the inventors did not challenge the Examiner's disallowance on the ground that their intended use of the process was to inspect the position of side panels whereas Weyenberg inspected the position of other components. Instead, they amended Claims 1 and 9 to include the "substantially opaque to visible and/or ultraviolet light" limitation, suggesting that they were claiming a new and improved process over Weyenberg. If they thought the fact that the use of the same process to inspect the positioning of side panels was enough to make the invention unique, there would have been no reason to amend the claims as they did. Based on the amendment they did make, the Examiner inadvertently allowed the Claims based on the erroneous assumption that the amendment required the use of infrared radiation. As suggested in the Court's previous order on First Quality's motion for sanctions, it is doubtful the Examiner would have allowed the Claims had he realized they did not include the use of infrared radiation.

Citing *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367 (Fed. Cir. 2008), K-C argues that structural limitations of a process patent must be considered in construing the claims of such a patent. (ECF No. 455 at 19.) That may be true. But there is a difference between the structural limitations of a process patent and the structural limitations of the product the process is used on. *Microprocessor Enhancement Corp.* addressed the question of

13

whether a patent that claimed a method of executing instructions in a pipelined processor was invalid because it was indefinite. The Court held that reciting the physical structures of the system in which a claimed method is practiced does not render the claim indefinite and thus invalid. *Id.* at 1374. The question raised here is whether the slightly varied use of a previously patented process provides the novelty required for issuance of a new patent. Clearly it does not. An X-Ray machine that uses radiation to detect fractures in the tibia, which is the same as the machine used to locate anomalies in the spine is not a new invention. So, here, K-C's use of the Weyenberg process to determine the position of its side panels did not make the previously patented process novel, especially in view of the fact that Weyenberg encompasses the very use described in the disputed claims.

Accordingly, the Court finds, based on the undisputed facts before it, that the presumption of validity is overcome and Claims 1 and 9 of the '451 Patent are invalid under 35 U.S.C. § 102(b) as anticipated by Weyenberg. Claims 4 -6 and 12-13, which depend from those claims are invalid for the same reasons. K-C's motion for summary judgment asserting validity, Docket 454, is **DENIED** and First Quality's cross motion for summary judgment declaring the '451 Patent invalid, Docket 494, is **GRANTED**.

Dated this   3rd   day of December, 2011.

                                                s/ William C. Griesbach
                                                William C. Griesbach
                                                United States District Judge